**EXHIBIT A**

### Page 1

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
 3           FOR THE DISTRICT OF UTAH - CENTRAL DIVISION
 4
    TCS-TEXAS, L.P., a Utah limited
 5  partnership,
 6              Plaintiff,
 7        v.
                                      Case No.
 8  GRAMERCY EMERGENCY MANAGEMENT      2:18-cv-00396-JNP-BCW
    PLLC, a Texas professional
 9  limited liability company,         Magistrate Judge
    MERCER EMERGENCY CENTER -          Brooke C. Wells
10  VICTORIA, LLC, a Texas limited
    liability company, GRAMERCY
11  EMERGENCY CENTER - VICTORIA
    LLC, a Texas limited liability
12  company, UCHENNA K. OJIAKU, an
    individual, EMMANUELLA
13  AKUAZOKU, an individual, VICTOR
    HO, an individual, ARIELLE T.
14  LAWSON, an individual, JAMES E.
    GROSSMAN, an individual, and
15  KATHLEEN M. GROSSMAN, an
    individual,
16
                Defendants.
17
18                    DEPOSITION OF
19                      VICTOR HO
20                   JUNE, 27th, 2019
21                      9:21 a.m.
22               1001 MCKINNEY, SUITE 560
23                    HOUSTON, TEXAS
24
25                  Alyssa Poor, RPR
```

### Page 2

```
 1                         INDEX
 2                                                    PAGE
 3  Appearances.........................................  3
 4  VICTOR HO
 5      Examination by Mr. Joffee......................  4
 6  Deposition Errata Sheet............................ 50
 7  Reporter's Certificate............................. 53
 8
 9                        EXHIBITS
10  NO. DESCRIPTION                                    PAGE
11  Exhibit No. 1......................................  17
        Packet to Gramercy from TCS-Texas containing
12      agreements and contracts
    Exhibit No. 2......................................  20
13      Document entitled "Lessee Disclosure
        Acknowledgement"
14  Exhibit No. 3......................................  23
        Document entitled "Master Lease Agreement"
15  Exhibit No. 4......................................  23
        Document entitled "Amended and Restated Lease
16      Schedule to Master Lease Agreement"
    Exhibit No. 5......................................  31
17      Quickpro Equipment inspection report
    Exhibit No. 6......................................  37
18      Document entitled "Individual Guaranty"
    Exhibit No. 7......................................  41
19      6-21-2018 e-mail to Deanna Milsap from Wayne
        Kitchens
20  Exhibit No. 8......................................  43
        11-06-2017 letter to Jeff Weiss from David
21      Harberg
    Exhibit No. 9......................................  46
22      5-10-2018 letter to Victor Ho, Arielle Lawson,
    and other partners from Jason Rogers
23
           (Exhibits 1 through 9 were attached to the original
24                        transcript.)
25
```

### Page 3

```
 1              APPEARANCES FOR COUNSEL
 2  ON BEHALF OF THE PLAINTIFF:
 3      Steven J. Joffee, Esq.
        MICHAEL BEST & FRIEDRICH, LLP
 4      2750 E Cottonwood Pkwy, Suite 560
        Cottonwood Heights, Utah 84121
 5      (801) 833-0506, fax (801) 931-2500
        Sjoffee@michaelbest.com
 6
    ON BEHALF OF THE DEFENDANTS, VICTOR HO and ARIELLE T. LAWSON:
 7
        Michael F. Skolnick, Esq.
 8      KIPP & CHRISTIAN
        10 Exchange Place, 4th Floor
 9      Salt Lake City, Utah 84111
        (801) 521-3773, fax (801) 359-9004
10      Mfskolnick@kippandchristian.com
11  ON BEHALF OF THE DEFENDANTS, JAMES E. GROSSMAN and KATHLEEN M. GROSSMAN:
12
        Katy Baird, Esq.
13      ANDREWS MYERS
        1885 Saint James Place, 15th Floor
14      Houston, Texas 77056
        (713) 850-4245, fax (713) 850-4211
15      Kbaird@andrewsmyers.com
```

### Page 4

```
 1     (9:21 a.m.)
 2              VICTOR HO,
 3   Having been first duly sworn, testifies as follows:
 4              EXAMINATION
 5  BY MR. JOFFEE:
 6   Q.  Good morning.  Would you please state your full name
 7  for the record?
 8   A.  Victor Ho.
 9   Q.  And Dr. Ho, how would you like me to refer to you
10  today during the deposition?
11   A.  It doesn't matter.  Dr. Ho, Victor, I don't care.
12   Q.  Okay.  Thank you.
13          MR. SKOLNICK:  Steve, may I just ask before we
14  get going, can counsel identify their presence on the record?
15          MR. JOFFEE:  Absolutely.
16          MR. SKOLNICK:  So Michael Skolnick for Dr. Ho
17  and also Arielle Lawson.  And I understand that they are both
18  present with our court reporter and videographer there in
19  Houston.
20          MS. BAIRD:  We have on the phone Katy Baird on
21  behalf of Dr. Grossman and Dr. Ojiaku, O-J-I-A-K-U.
22          MR. JOFFEE:  As I said earlier, I'm Steve Joffee
23  on behalf of TCS-Texas.
24   Q.  (BY MR. JOFFEE)  Victor, have you ever been deposed
25  before?
```



Page 5

1  A. Yes.
2  Q. I'm going to still begin by going over a few ground
3  rules with you that will help the deposition go as smoothly as
4  possible today. Today I'm going to be asking you a series of
5  questions, and it's your responsibility to answer those
6  questions. Do you understand that?
7  A. Yes.
8  Q. And there's a court reporter in the room, and he or
9  she is going to be writing down every word that we say.
10 Because of that, it is important that we not speak over one
11 another and that we give -- and that you give verbal responses,
12 yes/no as opposed to non-verbal gestures or nods and things
13 like that. Do you understand that?
14 A. Yes.
15 Q. If you don't hear a question that I ask or if you
16 don't understand a question that I ask, I'd ask that you let me
17 know and ask to either rephrase or repeat the question; is that
18 fair?
19 A. Yes.
20 Q. So, you answer a question that I've asked, I'm going
21 to assume that you heard the question and that you understood
22 the question; is that fair?
23 A. Yes.
24 Q. You're under oath today, correct?
25 A. Yes.

Page 6

1  Q. And Victor, tell me what you understand it to mean to
2  being under oath?
3  A. To tell you what I believe -- or what I know to the
4  best of my knowledge.
5  Q. So given that you're under oath today when you answer
6  my questions, I'm going assume that you're answering truthfully
7  and to the best of your ability. Is that fair?
8  A. Yes.
9  Q. Is there any reason that you wouldn't be able to
10 testify truthfully and honestly today?
11 A. No.
12 Q. Are you on any kind of medications that would impact
13 your ability to recall facts or to say what you mean?
14 A. No.
15 Q. You mentioned that you've been deposed before.
16 Approximately how many times?
17 A. Five.
18 Q. Can you briefly describe the nature of the cases in
19 which you were deposed?
20 A. The most recent case was involving, um, a bank BBVA
21 Compass in discovery for a case with Mercer -- Emergency Center
22 Victoria. The previous one to that the rest are all medical.
23 The last one was involving a case with -- I'm trying to think
24 who it was -- I can't remember who it was. It ended up being a
25 medical case that was dismissed involving a patient, of course,

Page 7

1  that a patient -- complaint to me in the ER misdiagnosing, but
2  it was dismissed. That was one. The one previous to that was
3  another case for --
4  Q. Let me just stop you for one second. I don't mean to
5  interrupt, but I want to the make it easier for you. You said
6  one was a case against BBVA Compass, and the others were for
7  malpractice cases?
8  A. Yes.
9  Q. Okay. The case -- the most recent case with BBVA
10 Compass, you said involved Mercer?
11 A. Yes.
12 Q. And what is Mercer?
13 A. Mercer is a medical -- a company that ran a
14 freestanding emergency department.
15 Q. And is that a debt collection case?
16 A. Yes.
17 Q. And what's the status of the case?
18 A. That was discovery. That's all I know.
19 Q. Is it ongoing?
20 A. Yes.
21 Q. And are you -- are you personally named the defendant
22 in that case?
23 A. Yes.
24 Q. Do you know how much money is in dispute in that
25 case?

Page 8

1  A. Not exactly. I would have to go back to you on the
2  exact number.
3  Q. Do you have an approximate idea? Is it hundreds of
4  thousands, millions, billions?
5  A. Millions.
6  Q. Have you ever testified in a trial before?
7  A. No.
8  Q. How about in any type of evidentiary hearing or
9  arbitration proceeding?
10 A. No.
11 Q. And you're represented by counsel today, correct?
12 A. Yes.
13 Q. And Mr. Skolnick is your counsel; is that correct?
14 A. Yes.
15 Q. Did you do anything to prepare for your deposition
16 today?
17 A. No.
18 Q. Did you discuss your deposition today with anyone
19 other than Mr. Skolnick?
20 A. No.
21 Q. And I assume then you didn't review any documents to
22 prepare for your deposition today?
23 A. I'm sorry. Yes, I reviewed documents that were
24 forwarded -- I believe that was disclosed to you and they were
25 forwarded to me. I got an e-mail saying these are our



Page 9

1  documents.
2  Q. So, I just want to make sure I understand. So you
3  reviewed the documents that I forwarded to Mr. Skolnick?
4  A. I believe so, yes. I believe that's what the -- I
5  have to look at the e-mail again but, like I said, I just
6  finished working at four in the morning, so I believe that's
7  what I said.
8  Q. Okay. All right. Thank you. Did anything in those
9  documents refresh your recollection as to what this case is
10 about?
11 A. Could you repeat the question?
12 Q. Did anything in your review of those documents
13 refresh your recollection as to the matters that this case is
14 about?
15 A. Refresh -- yes, it was a quick review.
16 Q. Do you recall what documents you reviewed?
17 A. One was the lease agreement with TCS. I believe
18 there were several documents under that category that were
19 included. One was the -- your -- I believe it was your firm's
20 request for some information first -- I don't know what it's
21 called -- answer of some questions, those are the only thing I
22 remember there were a total of. I don't remember how many
23 there were. Maybe eight or nine, five or six, eight or nine
24 documents, something like that.
25 Q. Okay. When you're talking about the answers to

Page 10

1  questions, were you talking about discovery responses?
2  A. I don't know the verbiage. That sounds correct.
3  Q. Okay. Can you just briefly describe your educational
4  background for me?
5  A. Undergraduate in engineering at Northwestern, medical
6  school in Oklahoma, and then residency in Philadelphia in
7  emergency medicine.
8  Q. After your residency, where did you first start
9  working as a physician?
10 A. Houston, Texas.
11 Q. And what year did you finish your residency?
12 A. 1997.
13 Q. And have you been a practicing physician since that
14 time?
15 A. Yes.
16 Q. And you are an ER physician; is that correct?
17 A. Correct.
18 Q. Are you currently employed in the position?
19 A. Yes.
20 Q. Where?
21 A. In Beaumont, Texas and port Port Arthur, Texas.
22 Q. Who is your employer?
23 A. Beaumont Emergency Medicine Associates and Golden
24 Triangle Emergency Center.
25 Q. Do you have ownership interests in either of those

Page 11

1  entities?
2  A. Yes.
3  Q. You said Beaumont Emergency -- what was the last
4  part?
5  A. Medicine Associates.
6  Q. And when was that formed?
7  A. 2007.
8  Q. What's your ownership interest in Beaumont Emergency
9  Medicine?
10 A. One-sixth partnership.
11 Q. Do any of the other named defendants in this case
12 have ownership interests in Beaumont Emergency Medicine?
13 A. No.
14 Q. So the another five-sixth interests are not owned by
15 anyone who had any ownership in Gramercy Emergency Management,
16 correct?
17 A. I'm not sure I understand the question. Repeat that
18 again, please.
19 Q. So you own one-sixth of Beaumont, the other
20 five-sixths are not owned by any individuals who have ownership
21 interests in Gramercy Emergency Management, correct?
22 A. If I understand your question, you're saying that the
23 other five named defendants don't have any ownership in
24 Beaumont Emergency Management or Gramercy?
25 Q. Beaumont.

Page 12

1  A. No. They do not own anything in Beaumont, correct.
2  Q. Okay. And then you mentioned Golden Triangle.
3  What's the full name of the entity?
4  A. Golden Triangle Emergency Center.
5  Q. And do you have ownership interest in that as well?
6  A. Yes.
7  Q. What's your ownership interest?
8  A. Eight percent.
9  Q. And Victor, did any of the other defendants or owners
10 of Gramercy Emergency Management have an ownership interest in
11 Golden Triangle Emergency Center?
12 A. No.
13 Q. Approximately, how many hours do you work a week?
14 A. 40.
15 Q. Approximately, what was your salary in 2018?
16    MR. SKOLNICK: I'm going to object. I've given
17 some latitude scheme of questions that pertain to the
18 defendant's personal professional engagement currently, and
19 also to things that touch on assets, but now you're getting
20 into areas that really have no bearing on whether there's
21 liability in Utah case and -- let him answer the next question,
22 but I just want it to be on record that I made -- instructed
23 him not to answer it. If you want to persist that's fine, we
24 likely will need to take it up with the Court.
25    MR. JOFFEE: Understood.



Page 13
1     MR. SKOLNICK:  You can answer.  Can the question
2 be read back, please?
3     (Requested portion was read.)
4     THE WITNESS:  I'm an independent contractor, so
5 I have a salary based on that and I don't have my taxes yet,
6 um, an approximation -- $400,000.
7   Q.  (BY MR. JOFFEE)  Victor, do you have any plans or
8 intent to declare bankruptcy personally?
9   A.  The thought has crossed my mind.
10   Q.  Tell me what you understand about the case on why
11 you're here today?
12   A.  TCS is a company that provided funding to a -- for us
13 for Mercer Gramercy to rent or lease radiological equipment for
14 our freestanding emergency center.  The -- there's details
15 involving the equipment itself, but the ends result is that the
16 emergency center was not -- did not become physically solvent
17 and we had to close the doors and we had to break the lease,
18 from my understanding.  We had to return the equipment.  We
19 received notice from TCS stating that that's a breach and now
20 we're being sued for any remaining monies.
21   Q.  (BY MR. JOFFEE)  You said that Gramercy Emergency
22 Management is also referred to as Mercer?
23   A.  Yes.
24   Q.  Are those separate entities?
25   A.  There's -- synonymously I believe those are DBA.

Page 14
1   Q.  And you said it was no longer in business.  Why did
2 it go out of business?
3   A.  The -- it became physically insolvent.  Monies coming
4 in were not leading the costs.
5   Q.  When I use the word Gramercy today, I am going to be
6 referring to Gramercy Emergency Management and Mercer; is that
7 fair?
8   A.  Yes.
9   Q.  Did you own a percentage of Gramercy?
10   A.  Yes.
11   Q.  How much did you own?
12   A.  About believe one-third.
13   Q.  And who are the other owners?
14   A.  Dr. James Grossman and Dr. Uchenna Ojiaku.
15   Q.  And do they each own one-third as well?
16   A.  Yes.
17   Q.  And is Gramercy still an active entity?  Has it been
18 dissolved?
19   A.  It is still open on the books, but it is not active.
20   Q.  What role did you play personally at Gramercy when it
21 was in operation?
22   A.  I was one of the partners.
23   Q.  Did you practice as a physician there?
24   A.  Yes.
25   Q.  And when you were describing the nature of the case

Page 15
1 you mentioned TCS.  I'm going to be using the acronym TCS today
2 to refer to TCS-Texas L.P.  Is that fair?
3   A.  Yes.
4   Q.  Do you know how Gramercy -- how you and your partners
5 first became aware of TCS?
6   A.  No.
7   Q.  And at some point did you and your partners decide
8 you wanted to lease medical equipment?
9   A.  Yes.
10   Q.  And did you look at various companies, or did you
11 just go directly to TCS?
12   A.  I was not part of that process.
13   Q.  Who was?
14   A.  Dr. Ojiaku.
15   Q.  And so Dr. Ojiaku, he was the one solely responsible
16 for going out and looking for a finance lease company?
17     MS. BAIRD:  Objection.  Form.
18     THE WITNESS:  He assumed that role.  We each
19 took a thing we were going to do.  That was his role was too
20 look for equipment.
21   Q.  (BY MR. JOFFEE)  Victor, are you familiar with a
22 company called Atlantis Worldwide?
23   A.  Yes.
24   Q.  What is Atlantis Worldwide?  And I'm just going refer
25 to Atlantis Worldwide today as Atlantis.

Page 16
1   A.  That's fine.  I believe they were the actual owners
2 of the radiological equipment.
3   Q.  You said the owners of the radiological equipment.
4 By that do you mean the vendor?
5   A.  Yes.  I believe that's the proper term.
6   Q.  Do you know how Gramercy became familiar with
7 Atlantis -- how they found Atlantis?
8   A.  No.
9   Q.  That would have been Dr. Ojiaku?
10   A.  Yes.
11   Q.  Do you understand that Gramercy elected to have the
12 equipment purchased from Atlantis?
13   A.  I can't recall.
14   Q.  Had you or Gramercy ever purchased refurbished
15 medical equipment before this transaction involving Atlantis?
16   A.  No.
17   Q.  Do you recall hearing anything about Atlantis'
18 reputation before you entered into the lease agreement with
19 TCS?
20   A.  At the time of the signing, I don't recall.  I've
21 seen documentation later that seems that was in question.
22   Q.  Are you aware of any conversations that TCS had with
23 Gramercy regarding TCS's concerns about buying medical
24 equipment from Atlantis before the lease was executed?
25   A.  I can't recall exactly.  Dr. Ojiaku would give us



Page 17
1  reports on the various companies, so when we were looking it
2  may have been mentioned, but I can't recall.
3       MR. JOFFEE:  Court reporter, if you could please
4  hand or mark the document behind tab number one.  And just for
5  clarity with the record, this is for document labeled beginning
6  in DEF 000001 and ending in 000075.
7       (Exhibit No. 1 marked.)
8    Q.  (BY MR. JOFFEE) So, Victor, I've just handed you a
9  document -- the court reporter's handed you a document marked
10 as Exhibit 1 to your deposition.  Do you recognize this
11 document?
12   A.  It was in the list of the documents that was sent to
13 me that I reviewed this morning.
14   Q.  It's dated April 4th, 2016.  Do you see that at the
15 top?
16   A.  Yes.
17   Q.  And do you recall reviewing this document in 2016 at
18 or around the time that it was said?
19   A.  This specific document, no.
20   Q.  Okay.  And you see it's direct to Gramercy and it's
21 from TCS-Texas and the first sentence below where it says "Re:
22 Master lease agreement" it says, "Enclosed are the following
23 documents for your review and execution."  Do you see that?
24   A.  Yes.
25   Q.  And then it lists several documents.  If you could

Page 18
1  turn the document with the face number which is the number in
2  the lower right-hand corner ending in 03?
3    A.  Okay.
4    Q.  Do you recognize this document?
5    A.  No, not really.
6    Q.  Let's take a look at it just briefly.  So look at
7  "Lessee Disclosure Acknowledgement."  Do you see that?
8    A.  Yes.
9    Q.  So, "This letter is to formally acknowledge that
10 Gramercy Emergency Management PLLC, a Texas professional
11 limited liability company as Lessee, has received the
12 disclosure letter regarding Atlantis Worldwide, LLC, a Delaware
13 limited liability company as Vendor for this transaction."  Did
14 I read that correctly?
15   A.  Yes.
16   Q.  And do you know what disclosure letter that's
17 referring to?
18   A.  No.
19   Q.  Would you turn to the next page?
20   A.  Okay.
21   Q.  This is a letter from Atlantis Worldwide to TCS.
22 Have you ever seen this letter before?
23   A.  Not until recently.
24   Q.  And the letter starts by saying, "In 2009 I was
25 sentenced to three years of probation for selling pre-owned

Page 19
1  mammography systems to a customer in New Jersey who
2  transshipped these systems to Iran," and then skipping down to
3  the fourth paragraph it says, "After cooperating with the FBI,
4  I still had to plead to the felony of conspiracy to make false
5  statements."  Do you see that?
6    A.  Yes.
7    Q.  And TCS provides this letter to Gramercy before the
8  lease was executed; is that correct?
9    A.  I don't recall.
10      MR. SKOLNICK:  Pardon me, Doctor.  Objection.
11 Lack of foundation.
12   Q.  (BY MR. JOFFEE) Do you what date the lease was
13 executed?
14   A.  No.
15   Q.  Could you flip back to the page before ending in 003?
16   A.  Okay.
17   Q.  The next sentence says, "By signing this
18 acknowledgment, Lessee assumes all rights and responsibilities
19 as further enforced by the Master Lease, lease number TCS20530
20 and holds TCS-Texas, L.P., a Utah limited partnership as Lessor
21 harmless of any issues or wrongdoings in the event of lack of
22 performance by the Vendor."  Did I read that correctly?
23   A.  Yes.
24   Q.  Were you aware before entering into the lease that
25 TCS had asked Gramercy to accept all liability in the event

Page 20
1  that Atlantis didn't perform under its agreements with
2  Gramercy?
3    A.  I don't recall.
4    Q.  Do you know this document that your looking at here
5  isn't signed.  Do you know if it ever was signed?
6    A.  I do not know.
7    Q.  And so no one ever told you personally, as far as you
8  recall, that the Vendor at Atlantis Worldwide was a convicted
9  felon and that he had been convicted for felony conspiracy to
10 make false statements, correct?
11   A.  I don't recall.  We had a lot of the meetings at that
12 time discussing a lot of different vendors, so it all is a
13 blur.  I do not recall.
14      MR. JOFFEE:  If the court reporter could hand --
15 or mark the documents that's behind tab two.  And for the
16 record, Bates label on the first page of this document is TCS
17 000104.
18      (Exhibit No. 2 marked.)
19   Q.  (BY MR. JOFFEE) So, Victor, this is the same
20 document that we just looked at except for this version is
21 signed.  Do you see that?
22   A.  Yes.
23   Q.  And does that refresh your recollection as to whether
24 Gramercy signed this Lessee disclosure acknowledge at some
25 point?



Page 21
1    MR. SKOLNICK: Objection. Lack of foundation.
2    THE WITNESS: Can you repeat the question again?
3    Q. (BY MR. JOFFEE) Do you recognize the signature on
4  the Gramercy line?
5    A. I mean -- there's a name there, it says Uchenna
6  Ojiaku, but I don't know his signature, per se, that might be
7  his. I don't know.
8    Q. You don't have any reason to dispute that that's his
9  signature? You do not know one way or the other?
10   A. Right. I don't know his signature.
11   Q. Okay. And the question that I recently asked is
12  whether this refreshes your recollection that Gramercy signed
13  this document?
14   MS. BAIRD: Objection. Lack of foundation.
15   MR. SKOLNICK: Same objection.
16   MS. BAIRD: Counsel, can we agree that one
17  objection does for all?
18   MR. JOFFEE: That's fine. Just so you
19  understand, object to form is not a proper objection in Utah.
20   MS. BAIRD: Right. The lack of objection --
21  lack of foundation, but are we in agreement that one does for
22  all? Because I will probably be interrupting less.
23   MR. JOFFEE: Yes, that's fine with me.
24   MR. SKOLNICK: That's agreeable.
25   MS. BAIRD: Thank you.

Page 22
1    Q. (BY MR. JOFFEE) So, Victor, sitting here today you
2  don't know whether or not Gramercy signed this Lessee
3  Disclosure Acknowledgment?
4    A. I don't recall if and when it was signed.
5    Q. Do you have a reason to dispute that Gramercy
6  received the disclosure letter that the tax, this Lessee
7  acknowledgement before the lease was executed?
8    A. I don't recall seeing it prior to -- I don't recall
9  seeing it.
10   Q. So you see that in the document it says that Gramercy
11  agrees to assume all rights and responsibilities and holds TCS
12  harmless for any issues of wrongdoing in the event of lack of
13  performance by Atlantis. Do you see that?
14   A. Yes.
15   Q. And in the last sentence of this Lessee Disclosure
16  Acknowledgment it says, "Lessee," that's Gramercy, "will be
17  required to meet all obligations under the Master Lease." Do
18  you see that?
19   A. Yes.
20   Q. Were you aware at the time that this was executed
21  that Gramercy had agreed to meet all of these obligations under
22  the Master Lease?
23   A. I don't recall exactly, but -- it's black and white,
24  but I don't recall exactly discussing this.
25   Q. You talked about the equipment earlier that Gramercy

Page 23
1  leased from TCS. Do you know specifically what that equipment
2  consisted of?
3    A. I believe -- I don't know the specifics, but it was
4  radiological equipment. So a CAT scanner, an X-ray machine --
5  I honestly don't know if the computers came with it. And we
6  had an ultrasound, but I don't know if it was part of this deal
7  or not.
8    MR. JOFFEE: All right. Court reporter, if you
9  could hand or mark for the witness as Exhibit 3 the documents
10  behind tab four, and then also mark as Exhibit 4 the documents
11  behind tab six. So tab four is Exhibit 3, and six is the
12  fourth. Thank you. Exhibit 3 is TCS 000091, and Exhibit 4 is
13  TCS 000006.
14   (Exhibit No. 3 marked.)
15   (Exhibit No. 4 marked.)
16   THE WITNESS: Okay. I have them.
17   Q. (BY MR. JOFFEE) Victor, you've been handed two
18  documents. One is marked Exhibit 3, and one is marked Exhibit
19  4. Beginning with Exhibit 3, do you recognize Exhibit 3?
20   A. No.
21   Q. So, it represents to you that this is the Master
22  Lease Agreement that was executed between TCS and Gramercy.
23  You never reviewed this lease?
24   A. I'm sorry. What was the question?
25   Q. Did you ever review this Lease Agreement?

Page 24
1    A. I don't recall.
2    Q. If you'll flip to the second to last page, page
3  number 096?
4    A. Yes, I'm there.
5    Q. Okay. There's a signature by Dr. Ojiaku. Do you see
6  that?
7    A. Yes.
8    Q. And it's also signed by someone for TCS. Do you see
9  that?
10   A. Yes.
11   Q. And if you go back to the first page of the document,
12  there's a date in the upper right-hand corner it says April
13  4th, 2016. Do you see that?
14   A. Yes.
15   Q. And then paragraph one says "Scope of Lease" and it
16  says, "Lessor agrees to lease to Lessee, and Lessee agrees to
17  lease from Lessor the equipment, property, software, and
18  capitalized costs (the 'Leased Property') described in each
19  lease schedule (a 'Schedule') executed pursuant hereto." Did I
20  read that correctly?
21   A. Yes.
22   Q. And so what that says is that Gramercy is agreeing to
23  lease certain equipment described in a Lease Schedule. Is that
24  your understanding?
25   A. Yes.



Page 25

1  Q. And Exhibit 4. Do you recognize this document?
2  A. No.
3  Q. So, I represent to you that this is the Amended And
4  Restated Lease Schedule No. 001. So, at the time that the
5  lease was signed, there was something that was called Lease
6  Schedule No. 001 that was subsequently amended, and the Lease
7  Schedule -- the Amended Restated Lease Schedule No. 001 became
8  the effective Lease Schedule. And just to refer you to the
9  documents that the Lessee is Gramercy, the Lessor is TCS-Texas.
10 Do you see that?
11 A. Yes.
12 Q. And paragraph one says, "Leased Property: Radiology
13 and Medical equipment as more fully described on the attached
14 Exhibit A." Do you see that?
15 A. Yes.
16 Q. And that's consistent with what you said earlier that
17 this was radiological equipment, correct?
18 A. Yes.
19 Q. And if you'll turn to the third page of this document
20 of the Bates number ending in 008, this is the Exhibit A that's
21 referred to in paragraph one of Exhibit 4. This is a list of
22 equipment. Could you just briefly review this list for me,
23 Victor, and confirm whether it's your understanding that this
24 is the equipment that Gramercy leased from TCS?
25 A. Okay. I reviewed the descriptions of the equipment.

Page 26

1  I don't recall if it's exactly everything that was at our
2  emergency center, but it includes a CT scanner, equipment,
3  radiology -- it appears to include all radiological equipment.
4  Q. If you'll turn back to the first page of Exhibit 4.
5  Paragraph five describes the base term says 48 months, correct?
6  A. Yes.
7  Q. And in paragraph six it describes the base monthly
8  rent, and it says that it's $9,037.39 plus applicable sales/use
9  and property tax, correct?
10 A. Yes.
11 Q. And in paragraph 12, would you read that for me?
12 A. Paragraph 12 -- "As additional security for the
13 financing provided hereunder, Lessee agrees to provide to
14 Lessor a Guaranty from Gramercy Emergency Center - Victoria,
15 LLC, Uchenna K. Ojiaku, Emmanuella C. Akuazoku,
16 A-K-U-A-Z-O-K-U, Victor Ho." On the next page, the
17 continuation, "Arielle T. Lawson, James E. Grossman, and
18 Kathleen M. Grossman to guaranty Lessee's obligations under the
19 Master Lease and all Schedules executed in connection
20 therewith; said Guaranty is attached hereto and made a part
21 hereof."
22 Q. Thank you. Did you understand, Victor, that you're
23 provision of a Personal Guaranty was required as security for
24 the financing provided by TCS to Gramercy?
25 A. I do now.

Page 27

1  Q. Did you at the time?
2  A. I understood at the time that we needed to get
3  equipment, and so I signed what was needed to be signed.
4  Q. Do you not dispute that you signed the Personal
5  Guaranty, correct?
6  A. Whatever was -- there was a lot going on at the time.
7  So we were trying to get the business started, so as each of us
8  brought forth what we needed, we signed what we needed to sign,
9  and we didn't question very much.
10 Q. I'm sorry. What was that?
11 A. Each of us had a role. We each brought forth and we
12 said this needs to be signed, let's move, there's things to be
13 signed.
14 Q. Victor, do you know what a finance lease is?
15 A. Not exactly.
16 Q. Would you just read -- you don't need to read that
17 out loud, paragraph 14 of the Lease Schedule for me?
18 A. Okay.
19 Q. Paragraph 14 says, in part, that this is a finance
20 lease and then under "(a)" it says, "Lessee has selected the
21 Leased Property in its sole discretion." Do you see that?
22 A. Yes.
23 Q. Do you have any reason to dispute that Gramercy, in
24 its sole discretion, selected the equipment to be purchased
25 from Atlantis?

Page 28

1  A. I guess, I didn't understand the -- you state --
2  could you repeat the question one more time?
3  Q. Do you understand that Gramercy selected to purchase
4  the leased property from Atlantis? Rather than some other
5  medical equipment vendor?
6  A. Actually, my understanding is that I thought we were
7  leasing the equipment, not purchasing it.
8  Q. So, yeah, and so what this says is the way the
9  finance lease works is a company, such as Mercer, goes to a
10 leasing company. It tells the leasing company we want to
11 purchase certain equipment from a certain vendor and then the
12 leasing company goes out, purchases that equipment, and leases
13 it back. And so my question for you is: If you understand
14 that it was Gramercy's decision to purchase the medical
15 equipment that TCS ultimately leased to Gramercy from Atlantis?
16        MR. SKOLNICK: I'm going to object to the
17 testimonial aspect of the last question. Doctor, you may
18 answer the question if you're able.
19        THE WITNESS: Well, by your explanation I'm not
20 disputing what you say. It's not my understanding of what
21 their agreement was, I guess, at the time, so I guess I
22 disagree with what you said.
23 Q. (BY MR. JOFFEE) Why?
24 A. My understanding is that from what you just
25 described, and again it's probably written out here in these



Page 29

1  articles in the specifics, but since I'm not a finance person
2  -- when they came, when the presentation was made to us that
3  this is the company we're going to use, TCS is going to provide
4  funding to then lease the equipment, I did not understand or --
5  now you're stating that it's for providing money to own the
6  equipment and that was never my understanding.  My
7  understanding is that this was leased equipment that they were
8  providing money to help us lease it that we're paying you, so I
9  didn't think we owned the equipment.  So, that's why I
10 misunderstood.
11     Q.  Okay.  I understand we're saying different things,
12 which is fine.  You see there under "(a)" it says, "Lessee has
13 Selected the Leased property in its sole discretion."  And you
14 don't have any reason to dispute the accuracy of that
15 representation, correct?
16     A.  Correct.
17     Q.  Do you remember when Gramercy received the equipment?
18     A.  I don't recall the exact date.
19     Q.  Do you remember the year?
20     A.  2016.
21     Q.  And when the equipment arrived, did you inspect it?
22     A.  I personally did not, no.
23     Q.  Did Gramercy have anyone inspect it?
24     A.  I don't recall.
25     Q.  Did you use the equipment?

Page 30

1      A.  Can you clarify what you mean?
2      Q.  Yeah.  At any point in time while Gramercy was in
3  operation, did you use the equipment that you leased from TCS?
4      A.  Yes.
5      Q.  And did you use the equipment at or around the time
6  that it was first delivered?
7      A.  No.
8      Q.  Never?
9      A.  Not when it was first delivered.  I did not work
10 there at that time.
11     Q.  When did you start working there?
12     A.  I do not recall the exact date, but it was much later
13 after the emergency center had been opened and -- I'd actually
14 have to look that up for you when I started working there to
15 pick up shifts.
16     Q.  Just to be clear you, you were always an owner,
17 correct?
18     A.  An owner of Mercer?
19     Q.  Gramercy.
20     A.  Yes.
21     Q.  And you hear complaints at or around the time the
22 equipment was delivered regarding the condition of the
23 equipment?
24     A.  Yes.
25     Q.  And who did you hear those complaints from?

Page 31

1      A.  The technicians --  radiological technicians.  There
2  were comments made by radiologists who were reading the films.
3  Then the staff, general staff at Mercer, including the
4  physicians, made note of the issue with the equipment.
5      Q.  Do you know if any kind of warranties were given
6  regarding the condition of the equipment by Atlantis, the
7  Vendor?
8      A.  Yes.
9      Q.  Do you know what the warranty consisted of?
10     A.  The specifics I'm not sure, but I do know that when
11 we noted equipment with radiological issues that were affecting
12 the quality the film, we went back to Atlantis to have them fix
13 the issue multiple times.
14     Q.  And how did Atlantis respond?
15     A.  They sent a -- they sent their own contracted service
16 personnel to come look at it, and had them look at it.  We
17 never received adequate cure to our issue.
18     Q.  Other than the warranty provided by Atlantis, are you
19 aware of any other warranties that were provided regarding the
20 condition or operation of the equipment?
21     A.  No.
22         MR. JOFFEE:  If the court reporter would please
23 mark as Exhibit 5 the document behind tab three which has a
24 beginning Bates label of TCS 000137.
25         (Exhibit No. 5 marked.)

Page 32

1         THE WITNESS:  Okay.
2      Q.  (BY MR. JOFFEE)  So, Victor, you have just been
3  handed a document marked Exhibit 5.  Do you recognize this?
4      A.  No.
5      Q.  Have you ever heard of a company equalled Quikpro
6  Equipment Inspection?
7      A.  No.
8      Q.  So if you look at this, this purports to be an
9  inspection report that was -- the date is March 1st, 2017.  Do
10 you see that?
11     A.  Yes.
12     Q.  And the location where the inspection occurred is at
13 Gramercy Emergency Management.  Do you see the address there?
14     A.  Yes.
15     Q.  Is that the address where Gramercy operated at the
16 emergency center?
17     A.  Yes.
18     Q.  And that's the address where the equipment that
19 Gramercy leased from TCS was located?
20     A.  Yes.
21     Q.  Toward the middle of the page there's a list of the
22 affirmations.  Question number three says, "Contact confirmed
23 that every item was in use/running at the time of scheduling."
24 You said you'd never seen this before and you're not familiar
25 with Quikpro, and so I'm assuming that you didn't make that



Page 33

1 affirmation; is that accurate?
2    A.  Correct.
3    Q.  Do you know who did?
4    A.  No.
5    Q.  Then skipping down to question 22 says, "The contact
6 stated that they are satisfied with the equipment."  Do you
7 know who made that affirmation?
8    A.  No.
9    Q.  Can you turn to the third page of the document under
10 question 19 "When was the equipment delivered?"  It says
11 December 19th, 2016.  Does refresh your recollection as to when
12 the equipment was delivered?
13   A.  Sure.  If that's what it states, yes.  I don't recall
14 the exact date.
15   Q.  Let's go back to Exhibit 3.  Do you have that in
16 front of you?
17   A.  Exhibit 3?  Yes, I do.
18   Q.  And so as we talked about before, this is the Master
19 Lease agreement between TCS and Gramercy.  Where you look at
20 paragraph one regarding the scope of the lease, I'm looking now
21 at paragraph three, could you read for me the sentence in all
22 capital letters?
23   A.  I'm sorry.  I don't see anything with all capital
24 letters.
25   Q.  Okay.  So if you go to -- you're on the first page,

Page 34

1 the right column, the first full sentence starting with Lessee
2 payment?
3    A.  Oh, it's section three.  I'm sorry.  I looked at the
4 paragraphs.  I'm sorry.
5    Q.  Yeah, no problem.
6    A.  Okay.  Yeah, I'm sorry.  Now I see what you're
7 talking about.
8    Q.  Could you read that out loud for me?
9    A.  Yes.  "Lessee's payment obligations shall be without
10 notice or demand, are absolute, unconditional and not subject
11 to abatement, reduction or setoff for any reason, including
12 without limitation the failure of the leased property to
13 function properly."
14   Q.  So, you understand, Victor, that Gramercy's
15 obligation pursuant to the lease was to make the lease payments
16 regardless of the operation or functionality of the equipment?
17   A.  I do now.
18   Q.  If you turn to the second page -- and I don't need
19 you to read this one out loud, but in paragraph nine or section
20 nine, however you want to refer to it, would you read the
21 language that's in all capital letters, please?
22   A.  Okay.
23   Q.  So, again, my question is:  Do you understand that
24 Gramercy has an obligation to make the lease payments
25 regardless of whether the equipment operates properly?

Page 35

1    A.  Yes.  By this statement, yes.  The all caps.
2    Q.  Paragraph 14.  "Lessee shall at all times bear all
3 risk of loss regarding the Leased Property, including without
4 limitation any damage, destruction, loss, impairment, defect,
5 malfunction, improper manufacture, warranty claim,
6 non-delivery, infringement, theft, governmental taking, or
7 otherwise."  Do you understand that Gramercy bore the risk for
8 any kind of issues relating to the functionality or proper
9 operation of the equipment?
10   A.  I do now.
11   Q.  And if you turn to paragraph 18.  Can you read for me
12 the language that is in all capital letters in bold?
13   A.  "Lessor is not the supplier or manufacturer of the
14 leased property, nor an agent thereof, and makes no
15 representation or warranty whatsoever, expressed or implied,
16 regarding the leased property, including without limitation as
17 to the merchantability, fitness for a particular purpose,
18 origin, quality, design, capacity, value, condition,
19 workmanship, materials, durability, suitability, the conformity
20 of the leased property to the provisions and specifications of
21 any purchase order or supply contract or non-infringement, and
22 expressly disclaims all representations and warranties, it
23 being agreed that the leased property is leased 'as is, where
24 is' with all faults."
25   Q.  And Victor, this is consistent with your testimony

Page 36

1 earlier that Gramercy didn't receive any warranties regarding
2 the functionality of the equipment with anyone other than
3 Atlantis, correct?
4    A.  Yes.  By this statement.
5    Q.  TCS disclaimed any warranties regarding the
6 functionality of the equipment, correct?
7    A.  By the documents, yes.
8    Q.  If you'll just turn to paragraph 29.
9    A.  Okay.
10   Q.  Can you just read that to yourself?
11   A.  Okay.
12   Q.  Do you understand one of Gramercy's obligations under
13 this lease to pay TCS's legal fees in the event that TCS
14 prevailed in this lawsuit?
15   A.  Yes.
16   Q.  And Victor, do you understand that by signing the
17 Personal Guaranty you agreed to be personally liable for any
18 attorney fees that incurred in connection with lawsuit in the
19 event that TCS prevails?
20   A.  I didn't understand that but by the document, I
21 understand.
22   Q.  And you understand, of course, that the longer this
23 suit goes on the larger the attorney fees are going to be,
24 correct?
25   A.  It makes sense, yes.



Page 37
1     MR. JOFFEE:  If the reporter would please mark
2  -- what are we on -- Exhibit 6.  The document behind tab seven.
3  The beginning Bates number is TCS 000044.
4         (Exhibit No. 6 marked.)
5     Q.  Victor, you've just been handed a document that's
6  been marked Exhibit 6.  Do you recognize this document?
7     A.  No.
8     Q.  So, at the top of this document it says Individual
9  Guaranty.  Do you see that?
10    A.  Yes.
11    Q.  And then the first sentence says, "This Individual
12 Guaranty (this 'Guaranty') is made by Victor Ho and Arielle T.
13 Lawson of 11831 Red Coat Lane, Houston, Texas, 77024,
14 ('Guarantor') to TCS-Texas."  Do you see that?
15    A.  Yes.
16    Q.  Are you the Victor Ho that's referred to in that
17 sentence?
18    A.  Yes.
19    Q.  Who is Arielle T. Lawson?
20    A.  That is my wife.
21    Q.  If you will turn to the page that has the Bates
22 number TCS 000047 there's some signatures on that page, and the
23 one on the left-hand.  Do you recognize that signature?
24    A.  Yes.
25    Q.  Is that your signature?

Page 38
1     A.  Yes.
2     Q.  Do you recall the date that you signed this
3  agreement?
4     A.  No.
5     Q.  If you'll turn two pages forward to the page ending
6  with Bates number 049.  There was some question in the answer
7  that you filed to the complaint as to the date on which you
8  signed this agreement.  This is a notary representation that
9  the document was signed before the notary.  Do you see that?
10    A.  I see a date of April 23rd by the notary.  I don't
11 see a date of when I signed it.
12    Q.  So, if you look at the page ending in 049 it says,
13 "On the 23rd day the April, 2016, before me personally came
14 Victor Ho, to me known to be the individual described in and
15 who executed the foregoing instrument who acknowledged me that
16 he/she executed the same."  Do you see that?
17    A.  Yes.
18    Q.  Do you have any reason to dispute the accuracy of
19 that statement?
20    A.  Repeat the question one more time?
21    Q.  The question is just if you have a reason to dispute
22 the accuracy of the notary's statement that you came before her
23 personally on April 23rd, 2016, to confirm that you had
24 executed this instrument?
25    A.  I honestly don't recall.  I've been to a bunch of

Page 39
1  notaries and signatures --  I honestly don't know who Vicky
2  Carey is.
3     Q.  Now my next question:  You do not have a relationship
4  with Vicky Carey?  Did she work for you?
5     A.  I don't know the name.
6     Q.  Okay.  You don't dispute that you signed this
7  Personal Guaranty, correct?
8     A.  Correct.
9     Q.  Can you go back to the first page of the Individual
10 Guaranty, paragraph D.  Do you see that?
11    A.  Yes.
12    Q.  It's says, "Guarantor is willing to guarantee
13 Lessee's obligations under each Lease in accordance with the
14 provisions set forth herein."  Do you see that?
15    A.  Yes.
16    Q.  Did you understand that you are agreeing to fulfil
17 Gramercy's obligations in the event that it did not do so
18 itself?
19    A.  I do now.
20    Q.  And that paragraph one says, "Guarantor hereby
21 unconditionally."  What does unconditionally mean to you?
22    A.  Without condition.
23    Q.  "Unconditionally guarantees the full, complete and
24 prompt payment, performance and observance of all of Lessee's
25 obligations under each Lease, including without limitation the

Page 40
1  payment of rents and all other amounts under each Lease, as
2  well as the payment of all amounts required or provided for
3  under each Lease resulting from Lessee's breach or
4  non-performance thereof (all guaranteed obligations hereunder
5  referred to hereafter as the 'Indebtedness')."  And so by
6  signing this you agreed to unconditionally guarantee to perform
7  the obligations of Gramercy in the event that Gramercy failed
8  to do so, correct?
9     A.  By this statement, yes.
10    Q.  And you confirmed earlier that one of Gramercy's
11 obligations under the Master Lease Agreement was to make it
12 least payments regardless of functionality of the equipment,
13 correct?
14    A.  For what for the document?  I understand that now,
15 yes.
16    Q.  And so do you understand that it's your personal
17 obligation now to make those payments if Gramercy doesn't make
18 them?
19    A.  By contract, I understand these written contracts,
20 yes.
21    Q.  Victor, do you know if Gramercy had made the payments
22 that they contractually agreed to make to TCS?
23    A.  To the best of the my knowledge, we made every
24 payment to the point that we closed the doors, or shortly
25 before closing the doors.



Page 41
1  Q. Do you understand that a payment was due in May 2018,
2  and that that payment was not made?
3  A. I did not.
4  Q. Do you understand that there are payments that are
5  due in owing under the Lease that Gramercy has not made?
6  A. Yes. Our company is closed.
7  Q. And you understand that the failure to make those
8  payments constituted a breach of the lease?
9  A. Yes, I do now.
10      MR. JOFFEE: If the reporter will mark the
11 document behind tab 17. It's Bates number TCS 000102.
12      (Exhibit No. 7 marked.)
13      THE WITNESS: Okay.
14  Q. (BY MR. JOFFEE) Okay. Victor, you've just been
15 handed a document marked Exhibit 7. Do you recognize this
16 document?
17  A. I don't recall.
18  Q. So, this is an e-mail sent from Wayne Kitchens. Do
19 you know who Wayne Kitchens is?
20  A. Yes, I do.
21  Q. Who is Wayne Kitchens?
22  A. He is a bankruptcy attorney.
23  Q. And it was sent on June 21st, 2018. Do you see that?
24  A. Yes.
25  Q. And it was sent to Deanna Milsap?

Page 42
1  A. Yes.
2  Q. Do you know who Deanna Milsap is?
3  A. No.
4  Q. I'll represent for you that she works for TCS. In
5  this e-mail Mr. Kitchens says that "Gramercy has ceased
6  operations" and I just want to confirm. Do you recall exactly
7  when Gramercy ceased operations?
8  A. The exact date, I cannot recall.
9  Q. At and of June 21st, 2018, was the statement that
10 Gramercy had ceased operations accurate?
11  A. Yes.
12  Q. Then is says, "The company is pursuing liquidation
13 options, including a possible bankruptcy filing." As far as
14 you were aware, did Gramercy ever file for bankruptcy?
15  A. No.
16  Q. Do you know if Gramercy intends to file for
17 bankruptcy?
18  A. We have engaged an attorney to review the facts and
19 decide.
20  Q. Where is the leased equipment currently located?
21  A. I have no idea.
22  Q. Do you know if it's still in Gramercy's possession?
23  A. I do not believe so.
24      MR. JOFFEE: If the reporter could mark the
25 document behind tab 12 which is Bates number DEF 000079?

Page 43
1  Exhibit 8.
2      (Exhibit No. 8 marked.)
3      THE WITNESS: Okay.
4  Q. (BY MR. JOFFEE) Victor, you have just been handed a
5  document that has been marked Exhibit No. 8. Do you recognize
6  this document?
7  A. Not on face value, no.
8  Q. The top was dated November 6th, 2017. Do you see
9  that?
10  A. Yes.
11  Q. And this comes from a David B. Harberg. Do you see
12 that at the top?
13  A. Yes.
14  Q. Do you know who Mr. Harberg is?
15  A. I've never met the man. I do not know him
16 personally.
17  Q. Do you understand him to be an attorney that
18 represents Gramercy?
19  A. I do recall now, yes. We were engaging an attorney
20 to try to recuperate, yes, from the bad equipment.
21  Q. And so this letter in the second paragraph says, "In
22 Early 2016, Dr. Ojiaku contacted you concerning the purchase of
23 radiology equipment for a new emergency care facility in
24 Victoria, Texas." Did I read that accurately?
25  A. Yes.

Page 44
1  Q. And do you have any reason to dispute that it was Dr.
2  Ojiaku who reached out to Atlantis regarding the equipment?
3  A. I have no reason not to believe that.
4  Q. Then the last sentence in that paragraph says, "Dr.
5  Ojiaku was also assured by representations on the Atlantis
6  website that the warranty provided by Atlantis 'further removes
7  risk' in purchasing refurbished equipment." Did I read that
8  accurately?
9  A. Yes.
10  Q. And do you have an understanding that Dr. Ojiaku was
11 collecting to have the equipment purchased from Atlantis in
12 part because of the warranty that Atlantis provided?
13      MS. BAIRD: Objection. Lack of foundation.
14      THE WITNESS: I don't recall.
15  Q. (BY MR. JOFFEE) If you turn to the next page, the
16 first sentence of that first paragraph says, "Based on
17 representations made through Atlantis' online advertising and
18 your personal representations to Dr. Ojiaku, Gramercy Emergency
19 entered into a Sales Agreement with Atlantis, effective March
20 1st, 2016." Do you know if that statement is true?
21  A. Based upon these documents placed before me, I
22 believe it is true.
23  Q. As you go to the second paragraph, the second
24 sentence on the same page, it says, "The Sales Agreement
25 includes a one-year express limited warranty covering parts and



Page 45

1  labor, warranting that the Equipment shall be free from defects
2  in material or workmanship under normal use and service, and
3  defective Equipment shall be repaired or replaced free of
4  charge during warranty period."  Do you see that?
5     A.  Yes.
6     Q.  And is that the warranty that you were referring to
7  earlier when you said, to the extent that there was any
8  warranty, that warranty came from Atlantis?
9     A.  I knew there was a warranty; I didn't know the
10 specifics.
11    Q.  If you turn the next page which is ends in Bates
12 number 801.  The third full paragraph on the page starts with
13 the words "Atlantis' failure."  Do you see that?
14    A.  Yes.
15    Q.  It says, "Atlantis' failure and refusal to honor its
16 expressed warranty constitutes a breach of express warranty
17 actionable under New York law" then there's a citation and it
18 says, "These actions also constitute a material breach of the
19 Sales Agreement that goes to the very root of the parties'
20 agreement."  Do you know if it was Gramercy's position at the
21 time that Atlantis had breached the sales agreement by not
22 providing equipment that alledgedly did not function properly?
23    A.  That was our contention, yes.
24    Q.  Did Gramercy ever sue Atlantis?
25    A.  I know we had discussions.  I honestly cannot recall

Page 46

1  if we moved forward.  I know that thinking back this was
2  created as an exploration.  I don't know if we were actually
3  able to devise of counsel or not.
4     Q.  Do you know anything about Atlantis' current status?
5  Is it still in operation?
6     A.  I have no idea.
7         MR. JOFFEE:  If the reporter could mark the
8  document behind tab 15?  It's DEF 000128.
9         (Exhibit No. 9 marked.)
10    Q.  (BY MR. JOFFEE)  So, Victor, you've been handed a
11 document that's been marked Exhibit 9.  Do you recognize this
12 document?
13    A.  Yes.
14    Q.  Do you see at the top that one of the people it is
15 addressed to is yourself?
16    A.  Yes.
17    Q.  And is that your address?
18    A.  Yes.
19    Q.  And it's dated May 10th, 2018.  Do you see that?
20    A.  Yes.
21    Q.  And this is a letter from Michael Best who represents
22 TCS to yourself and Gramercy and other defendants.  Do you see
23 that?
24    A.  Yes.
25    Q.  If you turn to the second page which is -- it ends

Page 47

1  with Bates 0129.
2     A.  Okay.
3     Q.  The third paragraph from the bottom says, "The amount
4  currently due and owing under the Lease is $382,878.13 (the
5  'Payoff Amount'), plus all attorneys' fees incurred by Lessor,
6  sales/use and personal property taxes."  Do you see that?
7     A.  Yes.
8     Q.  Did you receive this letter?
9     A.  I believe so.
10    Q.  And do you understand sitting here today that as of
11 May 10th, 2018, the amount outstanding under the Lease was
12 $382,878.13 plus all attorney fees sales/use and personal
13 property taxes plus pre/post interest?
14    A.  Yes.
15    Q.  And you understand, Victor, that you're personally
16 liable for that amount under the Individual Guaranty in the
17 event that Gramercy does not pay that amount and TCS prevails
18 in this lawsuit, correct?
19    A.  I understand that now, yes.
20    Q.  The next paragraph says, "However, if Lessee or the
21 Guarantors pay the monthly payment of $9,037.39, plus sales/use
22 tax due on May 18th, 2018, and the same monthly payment on the
23 first day of each month thereafter, so long as there is not
24 another Material Adverse Change or Default under the Lease,
25 Lessor will consider forbearing from exercising its remedies

Page 48

1  under the Lease."  Did I read that correctly?
2     A.  Yes.
3     Q.  Do you know if the paying of the $9,037.39 that was
4  due on May 18th, 2018, was ever made?
5     A.  I don't know.
6     Q.  You did not personally make that payment, correct?
7     A.  I don't know of any payment.
8     Q.  Have you ever personally written any checks to TCS to
9  pay for Gramercy's lease obligations?
10    A.  No.
11    Q.  And you said that you understand that based on the
12 Guaranty that you signed, you are obligated to make those
13 payments in the event that Gramercy failed you, correct?
14    A.  I understand that now.
15        MR. JOFFEE:  Let's take five-minute break.
16        (Whereupon a break was taken from 10:49 a.m. to
17        10:57 a.m.)
18        MR. JOFFEE:  I don't have any further questions.
19        MR. SKOLNICK:  Katy, do you have questions for
20 Dr. Ho?
21        MS. BAIRD:  No, I'll reserve.  Thank you.
22        MR. SKOLNICK:  And I have no questions.  We will
23 reserve the right to read and sign this deposition.  Okay.
24 Thank you, Victor, for your time.
25        THE WITNESS:  Okay.  Thank you.

Page 49

1  (Deposition concluded at 10:58 a.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 50

1            DEPOSITION ERRATA SHEET
2
3  Our Assignment No. 4183562
4  TCS-TEXAS, L.P., v. GRAMERCY EMERGENCY MANAGEMENT PLLC, MERCER
5  EMERGENCY CENTER - VICTORIA, LLC, GRAMERCY EMERGENCY CENTER -
6  VICTORIA LLC, et al.
7
8         DECLARATION UNDER PENALTY OF PERJURY
9
10     I declare under penalty of perjury that I have read the
11  entire transcript of my deposition taken in the above-captioned
12  matter or the same has been read to me, and the same is true
13  and accurate, save and except for changes and/or corrections,
14  if any, as indicated by me on the DEPOSITION ERRATA SHEET
15  hereof, with the understanding that I offer these changes as if
16  still under oath.
17
18         Signed on the _____ day of _____, 20___.
19
20  _____
21  VICTOR HO
22
23
24
25

Page 51

1  DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____Change to:_____
15 _____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 _____
19 Reason for change:_____
20 Page No._____Line No._____Change to:_____
21 _____
22 Reason for change:_____
23
24 SIGNATURE:_____DATE:_____
25        VICTOR HO

Page 52

1  DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____Change to:_____
15 _____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 _____
19 Reason for change:_____
20 Page No._____Line No._____Change to:_____
21 _____
22 Reason for change:_____
23
24 SIGNATURE:_____DATE:_____
25        VICTOR HO



Page 53

```
 1              C E R T I F I C A T E
 2   STATE OF TEXAS:
 3   COUNTY OF HARRIS:
 4
 5            I hereby certify that the foregoing transcript
 6   was taken down by stenography and the questions and answers
 7   thereto were reduced to typewriting under my direction; that
 8   the foregoing pages 1 through 53 represent a true, correct, and
 9   complete transcript of the evidence given upon said proceeding.
10   I further certify that I am not of kin or counsel to the
11   parties in the case, am not in the regular employ of counsel
12   for any of said parties, nor am I in any way interested in said
13   case.  Reading and signing by the witness has been reserved.
14            This, the 14th day of July, 2019
15
16   _____
         ALYSSA POOR, RPR
17
18
19
20
21
22
23
24
25
```

